2021 7-0-0-1-0 Brittany Marlow Colberg v. Eric Guerrero et al. We'll hear first from Mr. Abernathy. I'm sorry, Abernathy. Is it Nathy? Nathy, I apologize, but I said Nathy. Thank you. Good morning, thank you. The court stated Abernathy will be telling Brittany Holberg. The panel, of course, heard this case granted relief to Holberg based on her Brady claim, which is based on suppression of critical impeachment evidence about Vivian Kirkpatrick. The Texas Court of Criminal Appeals found Ms. Kirkpatrick was a key prosecution witness in this case. She claimed that Holberg admitted in jail when they were together that she, Holberg, took money by force, robbed Mr. Talberti, enjoined some of Mr. Talberti, dealt no remorse, and was willingly killed again in the same circumstances. The prosecution never disclosed, and so the jury never heard, that Kirkpatrick was paid thousands of dollars as a paid police informant by the same department that procured her testimony against Holberg, or that those police knew that Kirkpatrick depended on their informant payments to feed her own drug habit, or that they bonded her out of jail and got a charge against her just immediately after she gave a statement, or that Holberg, that Kirkpatrick, excuse me, lied to Holberg's jury, told the jury she testified only to be truthful and do the right thing, when in fact she was writing to the judge in her own felony case asking for probation as a reward for testifying against Holberg. The panel's majority opinion and dissent accepted that this evidence was suppressed and would be helpful to Holberg, and the state did not view otherwise. But the majority in dissent were to talk to me on whether the evidence was material either to guilt or sentence. It was to both. Kirkpatrick's testimony contradicted Holberg's claim of self-defense, but it also went directly to the robbery element required for capital murder. The state points at its briefs to a variety of circumstantial evidence as supportive of robbery, but there's a great deal of other evidence that raises questions about that proof and re-points to reasonable doubt. We briefed that evidence, but state's brief largely ignores it. Perhaps most importantly, Kirkpatrick's testimony was the only testimony that went directly to Holberg's intent, and the time when she formed the intent. The prosecution had to prove beyond a reasonable doubt that Holberg formed an intent to steal from Towers before or during the commission of the homicide, and after the fact decision to steal would not suffice. That's not robbery, and therefore it's not capital murder. All of the other evidence presented for robbery that's outlined in the state's brief is equally consistent with a conclusion that Holberg and Towery had an argument that escalated into a violent struggle, that Holberg killed Towery, and whether or not the self-defense was justified, that she decided after the fact that she was preparing to leave to take property, and that makes Kirkpatrick material, indeed critical, to capital murder. Even more so on the sentence. She testified in the guilt-innocent phase, but that testimony was reintroduced on sentence, and a great deal of it went to the sentence and not to Gale. For example, the prosecutor's opening ended with a dramatic flourish based on Kirkpatrick's testimony, who claims Holberg admitted she shoved a piece of a lamp into Towery's throat because she wanted to silence the gagging noises he was making as he was dying, and the prosecutor finished by telling the jury, Finally, the lamp has stopped the gagging noises. I suspect you will hear the gagging noises not in this courtroom, but in your thoughts, your sleep, and your dreams, maybe for the rest of your lives. In the penalty phase, the prosecutor went back to this. His expert went to this, emphasized what he called the gratuitous use of the lamp, and in closing, the prosecutor told the jury this here, both the expert and the DA. The jury heard Holberg present herself in Kirkpatrick's telling as dangerous, sadistic, and utterly without remorse, and it unquestionably affected the sentencing decision in this case. It's confession evidence which has unique power. Kirkpatrick was untouched by any effective impeachment. The suppressed evidence would have destroyed her credibility, and the jury took 11 hours to reach a death sentence here when a different decision by one juror would have changed the outcome. To repeat a little on materiality, obviously you're ready for questions by this court. Counsel, I have a question about page 31 of your red brief. It says, this is quoting your brief. The state of this court ruled Holberg was not entitled to relief because A, the prosecutor complied with Brady by opening his file to defendant. B, evidence is not suppressed if defendant already has it, and C, relief is available only if suppressed information is admissible. Where in the state of this decision did the state of this court say that? That's in the conclusions of law that are stated in the original state of this ruling. I'm looking at page 9763, which is your citation for the proposition, and I'm looking at paragraphs 1 and 2, which is what you cited for the proposition. I see nothing to even remotely come close to supporting what you said. So where does the state of this court say, A, B, or C? Well, obviously we read the decision differently, Your Honor, because— Can you show it to me? Can you read it to me? I don't have that page right in front of me, but you're referring to the page that we cited. The state court made a variety of findings of facts on relating different aspects of variety to other things, and then in the conclusions of law addressed the Brady claim, all of the Brady claims together, and explained in its conclusions that it concluded that Patrick, or that Don Colbert, rather, had not established an entitlement to relief for the Brady claim and had laid out those reasons. The only—literally the entire analysis, the entire reasoning of the case— correct me if I'm wrong, I'm just reading it to you— Colbert has failed to show that the state violated its obligations under Brady v. Maryland. That's 9764, paragraph 3. Where does the state habeas court say any of the things that you attributed to it? I mean, you said in a briefing you filed in our court the state habeas court rules Colbert was not entitled to relief for A, B, and C. We can't hear you over here. Oh, I'm sorry. Is this not on? Can you get into the mic? You said that the state habeas court made three holdings, A, B, and C. I'm asking you where the state habeas court made them. Well, I can only—I don't want to delay the point here. I obviously disagree on how we're reading the state habeas court's decision of the court laid out the findings and then specifically addressed the Brady claim and set forth three reasons and stated that it doesn't— I should be clear that that section of the decision doesn't specifically refer to Kirkpatrick. It also doesn't specifically refer to other aspects of the Brady claim that was presented to that court. It addressed the Brady claim all in a single section, and as we read that decision, this is the state court explaining the basis for its decision to reject the Brady claim. Now, if I'm understanding the point, you're saying that because the state habeas court never mentions— because Kirkpatrick, if I'm understanding it, you filed an eight-part Brady claim. So this is grounds for relief 34 of 35 in the state habeas application. There's eight subparts to it. Becky Bates, John Sneed, Katina Dixon, Part IV is Kirkpatrick, then Speer, Norell, Frazier, and Burnett. And because the state habeas court doesn't discuss each of them individually, there is no holding under which we would apply ethnos for a litigation bar. Is that the argument? No. Our argument, which the state disagrees, obviously, our argument is that the state court decision sets forth the reasons for denying the Brady claim as applicable to all the aspects of the Brady claim. The state can convene that that section, although it doesn't specifically exclude the Kirkpatrick claim, is intended to not apply to the Kirkpatrick claim. We disagree with that for the reasons stated in our brief, but I would add that if, in fact, the state habeas court gave reasons for denying the Brady claim but somehow did not intend them to apply to Kirkpatrick, then this would be a situation in which the Brady claim related to Kirkpatrick was properly presented, exhausted in the state court, but not addressed at all in this case. I'm looking for the case, I think it's Johnson v. Williams, who justified De Novo Review. Is it De Novo Review as to all eight parts of the Brady claim? I don't know that that's necessarily the case, Your Honor, but we have a certificate only to appeal the claim related to Kirkpatrick. So whether or not – whatever the standard would be for the other aspects of the Brady claim did not appeal here, we can't appeal here. Well, of course, we could grant the COA at any time, and we could obviously expand the COA. So I'm asking you if your theory of De Novo Review applies to all eight subparts of Ground 34 of 35 in the state habeas application. No, Your Honor, what I'm trying to suggest is that if the state didn't address – if the state habeas court didn't address them, even though properly preserved, De Novo would be appropriate. Ultimately, we're not arguing that the state habeas court didn't address the claim. We're arguing they addressed the claim and they set forth the reasons there in the decision, and those are the reasons that apply to Kirkpatrick. We have argued that De Novo Review should apply to the materiality element of the Brady claim as to Kirkpatrick because it wasn't addressed in the state habeas court's reasons. But I would add to that, ultimately, we don't believe that whether it's De Novo Review or it's review under the standard in 2254, that that doesn't ultimately cover the outcome. Can you address the standard under 2254 D1 about what makes the state court's application of Brady objectively unreasonable as opposed to a close cause? Can you address that and what your best case is for that? Assuming, aren't you going to note that it does apply and it wasn't addressed under materiality? Right, Your Honor. The state habeas court referred to an open fire policy, but there's nothing in the record that indicates that the suppressed impeachment information was in any open file that the prosecution provided to Hulbert's lawyers. The state habeas court also refers to- Was it in the file? There's nothing in the record to my knowledge, Your Honor, that would indicate that any of this record, any of this information was in any file that the prosecution furnished to Hulbert or her lawyers. What do you say about the affidavit that Hulbert's original trial counsel filed in 2011 where she explained why she did not cross-examine Kirkpatrick more diligently? Well, several things, Your Honor. She says she knew about Kirkpatrick being a state informant, correct? That's the state's argument. That's not what the record shows. That's not what the affidavit says? No, and I'd like to unpack that a little bit if I could, Your Honor. This argument was not argued below in the state habeas court or in the district court or in the original- Well, frankly, frankly, the argument about Brady and Kirkpatrick was numbered 33 in your points on appeal or in habeas, so it couldn't have been the most important to you either, but leave that. So the affidavit that is referred to here was made by trial counsel 13 years after trial, and it addressed at the state court's direction specific ineffective assistance of counsel issues that had been raised in habeas. In one of those points, and all of the arguments about Kirkpatrick and the impeachment being suppressed were already on the record in habeas and had been reviewed by trial counsel at the time she made this affidavit, so she was aware of all these issues and arguments. What she addressed was an ineffective assistance of counsel issue, arguing that she shouldn't call a reputation witness to testify that Kirkpatrick had a bad reputation for truthfulness. And she made several arguments as to why that wouldn't have made any difference, first being that she was the community in question's criminals and prostitutes, but also she said that if she had presented that reputation witness, law enforcement might have testified that Kirkpatrick provided helpful information to them in another case. There's absolutely nothing in the affidavit about any information that Kirkpatrick was a paid police informant or any of the other impeachment evidence that we've argued was known to the state but suppressed. Actually, later in the declaration, the state trial counsel talks about another claim that she should have cross-examined Kirkpatrick differently or more aggressively. In that section of the declaration, she doesn't say anything at all about Kirkpatrick providing information to the police as a reason for not cross-examining him. Mr. Abernathy, I hope you can get to the argument that Texas and the courts have been considering for the last 10 years as to materiality. But just a nail on disclosure, has Texas ever pointed in 10 years in federal habeas to a place in the record showing contemporaneous discovery disclosure of paid informant status? There's nothing in the record. Has any state or federal court in 20 years ever pointed and found that it was disclosed? No, there's nothing. Did the district court assume it wasn't disclosed in over 100% quoting corporate stallings who said, himself, sworn testimony under oath. No one until today knew Ms. Kirkpatrick had been an assistant to the Amarillo Police Department. If it had been disclosed, would it be constitutionally ineffective assistance of counsel to not use it for costs? So my questions are on what you've had to litigate for the last 10 years in federal court, which is whether or not this is material. And I have a question factually and I have a question legally. Are you saying when the government uses a paid informant to be their government agent witness and doesn't disclose it, that's always material? Or are you saying in these facts, capital case, defendant's own words accusing herself and not just grisly murder, but actually will do grisly murders again? Which is it? Is it factually always material legally? Or is it factually this case? I'm not arguing that in every case, as a matter of law, a failure to... Certainly, I'm arguing you have to disclose that your chief witness is a paid police informant. Is it material? There might be cases in which it's not material. I do think that depends on the facts. But here you have a situation where there's a violent struggle between two individuals. The defendant is claiming self-defense. It may have been a violent struggle that escalated to homicide, where self-defense ultimately wasn't supported. But that's still a very different situation from a sadistic, gratuitous killing. And it's a very different situation from a situation... Under trials in Strickler, do we ever say, oh, it's not material because there's sufficient other evidence as a matter of law? Or is your position that, yes, we can look at whether there was overwhelming other proof, but here this, in the minds of the jury, had to have affected whether or not they would return to death row? I think you can look at the facts. You have to look at the facts, and you have to review the whole record. And it's not obviously a matter of whether it had to change the jury's mind, but whether there's a reasonable probability, whether the evidence put the case in a different light in order to... with respect to the issue, whether it's guilt or sentence. But I want to emphasize, with respect to guilt, a jury might have decided that other evidence just doesn't get you to self-defense. Maybe they found other evidence to get them to the conclusion that Mulberg took something from Tallery when she left his apartment. But that still leaves a little critical question, which is, when was the intent formed? So I have a question about the lamp down the throat, and then I have a question about the lot of bills that she had on her after the killing. First, the lamp down the throat. You focused on that. You said it was the climax of the prosecution's presentation to the jury, the lamp down the throat to stop the girdling. If Kirkpatrick had been impeached and the jury didn't believe her anymore, what's the alternative theory in your mind for how the lamp ended up down the throat? Well, there was evidence, quote, from the scene, forensic evidence from the scene, and from Holberg's testimony, that there was a lengthy, extended violence struggle. She testified that in the course of that struggle, she used the lamp as a defensive weapon, trying to strike out at Tallery. So the theory is, in self-defense, she shoved the lamp down his throat. Well, self-defense is only one aspect, Your Honor, because there's also a materiality and sentencing issue here. I think this is more sentencing, but... Well, I mean, let's stay with the lamp. The autopsy report showed that it was shoved so far down his throat that it nicked his corroded artery. So I'm just struggling with... Okay, let's say Kirkpatrick is impeached. I'm on the jury. Ah, okay, now I understand the lamp down the throat was in self-defense. Is that the theory? That's a theory relating to guilt for innocence. But in terms of sentence, Your Honor, the testimony from Kirkpatrick that's critically important is that Holberg said, I got tired of listening to his gurgling or gagging noises as he's dying, so I shoved the lamp down his throat because I didn't want to listen to them anymore. That, in that level of satanism and cruelty, that has, I think, clearly a very direct impact on sentence. So 57 stab wounds is not sadistic with three different implements? Well, in a 45-minute struggle in which... Most humans can't imagine being stabbed once, much less nearly five dozen times, while trying to fight back. I've just, you know, this is sort of my layman's scary crime belief. Well, the jury, Your Honor, I think, obviously they're considering the violence and the number of wounds, but they're also considering the context, the trauma that Holberg experienced, the grounds she had to be in here. But, you know, in terms of the sentencing, did she use that as a statistic with a desire to be cruel or deceptive? That's an issue the jury had to consider. And in the context of a situation where this was not a calculated planned violent attack, she didn't bring a weapon with her. All the weapons that were used was a fork or a kitchen knife. And all of those things were things that were grabbed in the situation at the scene. Can I just also, I meant to ask you about the robbery. So you said that Kirkpatrick's testimony was also materialized for robbery. So if Kirkpatrick's testimony had been impeached, then the jury could have come to a different conclusion on the robbery motive, which is an aggravating factor. So what I want to ask you about is, I thought that there's testimony in the record from Cody Mayo and his girlfriend Misty Votaw that after the killing, Holberg offered them $200 for a ride. She had pulled out a wad of cash. One of the bills was bloodstained. Now, that testimony doesn't have anything to do with Kirkpatrick. So why isn't the testimony about robbery evidence so overwhelming that undermining Kirkpatrick on that just doesn't make any difference? I think, Your Honor, that in terms of materiality of the kill, Kirkpatrick is most clearly material to kill because of the robbery element requirement that she had to form the intent to take the property by force either before or during that commission of the act. Let's imagine that the jury looked at the bill, looked at all the other evidence of the state's outline and said, I believe she took either money or drugs or both. That doesn't answer the question, did she form the intent to do that after the homicide? That makes her gangeant homicide and gangeant theft, but it's not capital murder. None of the other evidence goes directly to that, but Kirkpatrick does because she testified that Holberg said to her, I went there to get money, I asked him for money, he wouldn't give it to me, so I took it from him, and while taking it from him, I killed him. That's the right evidence of the robbery element, but the comments read at the appropriate time, but that's the only evidence. Counsel, did Ms. Kirkpatrick testify dressed in a prison outfit, prison uniform? Do you know? I believe she was in jail clothing, and it was. She was, it did come out that she had a criminal charge. She had criminal charges pending, so it would have been readily apparent to everyone in the courthouse that in fact she was testifying and that she would hope to get some benefit later on from her testimony. So as I understand your complaint here, your position is that it's her informant status as to other crimes wherein she cooperated with the district attorney's office. Is that correct? I know I'm out of context. Yes, please. She actually flatly denied when she testified that she had any kind of deal of promise or expected any kind of deal of promise. What's impeaching that wasn't known was the people who took her statement against Holbrook, the Amarillo police, were paying her all this money in other cases. Of course, employment by the adverse party is always... I'm trying to focus on your complaint that she was an informant, a paid informant, on other crimes not associated with this one, and that is what, as I understand your argument, makes her a biased or a self-interested witness. Do you know of any of the times when she was a paid informant in the past she had given testimony or other information that proved false? I don't think there's anything in the record that points to any case where she gave false testimony, but it isn't only the thing that's part of it. It's also the fact that while she's telling the jury in this case, I don't expect anything. I'm just here to do the right thing. She's writing to her judge saying, I want you to give me probation, among other reasons, because I testified against Holbrook. Mr. Abernathy, you've also briefed a claim about ineffective assistance of counsel, and it's unclear to me what the position is. It's the position that any strategy that's described now, this girl-next-door strategy that she wouldn't be threatening in the community, was a post-talk rationalization to justify poor choices of not doing proper mitigation, or was it that it was the strategy, and we're sticking to it, no matter what we find out, that's contrary to the strategy that was actually support of a much stronger strategy, but we've run out of time. What is the argument? It's not, you know, our penal opinions have been vacated, and they didn't really address it, but did the court address it in the briefs? Can you please tell us what your argument is on this point? I think the primary argument here, Your Honor, is that the defense counsel made a decision at the outset of the case as to what their strategy was going to be. They refused to vary it, even when there were multiple red flags that showed things they should have been pursuing. They made the decision, oh, we're not going to look into anything that's not recent, so they didn't look into any of the early childhood trauma or being born with symptoms of addiction to drugs, and all of these other things, and they're outlined in the brief. I don't want to catalog every one of them, but the key point here, Your Honor, is that they enabled the situation by refusing to investigate, refusing to look at these other issues, where the prosecution was able to present a false narrative that this woman had a perfectly normal childhood, was in love with her parents, was a little bit of marijuana use in the house, got a big feel, she had love. They said everything was handled with a pepper on a silver platter. That's so far from the reality that could have been presented. Okay, and is that reviewed under the deferential ethics standard, or is any part of that reviewed? No, sir. I believe, Your Honor, that the ineffective performance is subject to 2254 review, but the state, I think, has conceded earlier in the case that prejudice wasn't addressed as a review subject. Thank you. Thank you. Unless my colleague has a further question, you've saved time for rebuttals. Does somebody have a question? I do have a question. I have a question. Is an informant's credibility a grating fact that needs to be known? Yes, Your Honor, I think that both exculpatory evidence and the impeaching evidence about a prosecution witness is subject to grading, and we're obviously in the latter category here, so it would have to have been disclosed. These facts, we would argue, have to have been disclosed. Is there any evidence in the record that the police department itself determined that Ms. Kirkpatrick was not a credible witness? There was this inferential evidence. Kirkpatrick's case was her, her burglary case, several weeks after Holbrook's trial. In that case, the prosecutor really salvaged Kirkpatrick's credibility, pointed out to the court that she lied about how many prior felonies she had, that she lied about how many burglaries she was involved in. So certainly, shortly after the trial, there's evidence that makes clear that she had a serious credibility problem. Did Corporal Stallings testify at her sentencing that because she told him the day he got her out on bond, the day she gave her statement, that she had committed 30 or 40 robberies and only got charged with one, that he decided not to use her anymore after that? I recall that there was testimony about the commission, the number of burglaries she had been involved in. Candidly, Your Honor, I'm having a hard time recalling specifically whether he testified that that was a reason to not use her. Corporal Stallings' testimony is in full in the record from the burglary case, and we cited just some of that. So it would be, Your Honor, that I have a specific recollection of that precise point. Seeing no other questions, you have saved time for rebuttal. Thank you. Thank you, Your Honor. We'll hear from Mr. Cole now. Thank you, Your Honor. Thank you, Chief Justice Elgar, and may it please the Court, if I can, I'd like to refocus the Court on Edna, which I think is the most straightforward way to resolve this crime. Of course, our position is that the Court should affirm that this report is denial of case because the litigation law forecloses both the gravy and the strength claims. Now, on the gravy claim, we have two arguments, the D-1 argument with respect to materiality and the D-2 argument with respect to expression. Materiality, D-1, is the most straightforward way to resolve this case. General, when you're asking about where we look for this, I agree with you in your other questions, Your Honor, that there are reasons for this confidential reporting period. And so, the reproduction and merits communication requires us to look at underheritance, and undersexed, and engaged by patent opinion, and then the reasons that could have supported that. Counsel, before you get to that, excuse me, the question of whether there were reasons that could be usefully explored, there are three paragraphs in the 2012, I guess it is, Habeas Court Opinion. The first paragraph lays out the basics of grading. The second paragraph concerns me. I looked through the findings, 130-some-odd pages. Is there anything in there where an open file policy by the prosecutor is identified factually? Is it accepted in this case that there was such a policy? And are there findings to that effect? I don't believe there are findings to the open file policy, but that's not one of the reasons that we need the court. What I'm asking, really, is you have argued that this is, the first two paragraphs are just setting out the rules of the road, and then having fully explored all the ways that you could understand grading and the ways that you could show a violation, the last paragraph says no violation. What I'm wondering is it does seem to me to be an incomplete list, the second paragraph primarily. But I don't know if it's at all valid to read, and I know you think it doesn't, I would say it's probably not valid to read this open file policy as a reason unless there are findings in the order that there was such a policy. And you're saying that's not in the record. Let me be clear, Judge Osler, we're not making an argument for the open file policy. We're not saying that's in the rule of law that you applied. The rule of law has issued some materiality on what we would say is in effect. But when we're looking to the reasons, what are the reasons? I think that can be an application of all facts. The reason given is this is basically a life-saving rift, in our view, in unreasoned state court cases. And what you do is... It's not an unreason if the court opinion was saying there's an open file policy and the evidence shows this information probably wasn't in the policy. And I'm not explaining myself very well, but I'm trying to get to it. That can't be the reason unless there's evidence that there was an open file policy. That's right, but that's not the reason for the rejection of confidentiality. Maybe it's helpful to consider, as Judge Osler was mentioning, the part where you claim there's all sorts of changes in the job scene and it can take you from this court to Nelson case and the case that we're thinking about, or you claim, it really is evidence-specific. And so we're really trading our focus, I think the court should, on confidential informant theory. And when we're asking, are there reasons the state courts offer for rejecting confidential informant theory, we say no, there are no reasons. The open file policy is one of them. So I recommend you look at that when you're assessing out whether there are reasons here. Now, assuming I've satisfied you with that, Judge Osler, I think the reason that we see loneliness is forwarded failure to show that the state violates its obligations under Brady v. Maryland. When we see that, that's essentially, I would say, akin to a summary denial of the claim. And when you have that, parents and sex slaves, courts getting impeded, indicates we look to what reasons could have supported the judgment. So if I can go to the reasons that couldn't support the judgment, we have you arguing about events. When we're talking about D1 suspected materiality, the question is, is there a reasonable application of banks, or is it contrary to banks? And we would suggest no unclosed problems. I'll talk about the contrary to problems, of course, in the case of Brady v. Maryland, in the case that... I want to just, actually, for me it would be helpful, because like the panel, like the district court quoting corporate stallings, I'm going to assume it wasn't disclosed. So the question is, materiality. And your position is it was not material to the defense, or to a jury that returns a verdict of death, to know that the only accusing witness was actually a government agent being paid. And that witness is the only, correct me if any of these are wrong, that witness is the only witness that tells the jury that Holberg herself accused herself of felony murder. No one else said what the jury had just heard from Holberg, with no prior conviction. She takes the stand, capital defendant, takes the stand, says that the man that's been paying her for sex for years initiated the fight, and she killed him. She admits that, but she says self-defense. There's no other witness that says, actually, Holberg herself told me in jail that she loved killing him, and describes in detail the gruesome... In fact, tell me, Kirkpatrick is the only witness that the government put on to say that Holberg said, the more she stabbed her, the prettier it was. Kirkpatrick is the only witness that said that Holberg said, her exact words were, it's fun and it's amazing. And Kirkpatrick is the only witness the jury heard that said that if Holberg had to do it all over again, she would anything to get drugs and money. Fact question, is there any other witness that the government put on that says that the defendant's own words, that she boasted she'd do it again for drugs and money? So there's a lot of fact in there. No, it's just a fact question. Is there any other witness that the government said that Holberg's own words should convict her and sentence her to death? The only testimony is Holberg's words, and Kirkpatrick's words. There's a couple of things in there. I can start with this. I think the analysis you're asking about is the no-vote count. Because at that time, you don't answer the sort of the no-vote question of whether it's material or whether it's not, unless Ms. Holberg can include the relegation mark. But you agree the state habeas court said nothing other than greatly denied with a paragraph before saying open files. No state court ever, no federal court, no state court ever has said what you're asking us to say, which is paid witness status or a person who says the defendant convicted herself is actually immaterial. Well, what I'm asking you to say, Judge Higginson, is the relegation mark. And the reason the relegation mark closes the claim is because there's no reasonable application of the Supreme Court precedent in that and there's no contrary to precedent in that. Okay, but that is the same question. Isn't it unreasonable for a court to say it's immaterial to the defense and ultimately the jury that gives the verdict of death? It was immaterial, didn't prejudice the defense. And here are the four places that I would see prejudice. Again, disagree. When Kirkpatrick testifies to all that, only six pages of cross, not a single question that the government might have purchased this testimony. Correct? We do not think that there's been an application of Supreme Court precedent in which the state habeas court reasoned that. But there was no cross at all that this is purchase testimony. There's no cross. Okay, and then in closing, the defense barely grasps at anything to impeach Kirkpatrick, starting out saying, well, really, could the blood have been spurting like a fountain? So they had no ability to test that she was testifying because the government was paying. Again, I love this. No, no, no, yes or no, and I have two other yes or no questions. And then just asking factually, when the government in rebuttal closing gets up and says to the jury, you can believe Kirkpatrick. Maybe Holberg isn't a vampire, but you can believe everything Kirkpatrick said because the details are so graphic. No ability to object. And finally, if this had been disclosed, paid government informed status, do you agree that under our jury instructions and under Supreme Court law, this jury would have been told they had to consider paid informed testimony with great caution and care? That's our mandatory instruction. I think that goes to materiality. No, no, no, it goes to materiality. Isn't it true it would be reversible error if a district court didn't give that instruction that the defense asked for because you had disclosed it? But now you're saying because you didn't disclose it, it's not reversible error that they didn't get it. The Supreme Court's case in Hoffa in 1966, two years before Brady, said the only reason we can trust testimony like this, such an incentive de laga, so compromised, is because Anglo-American safeguards exist, two of them, cross-examination and a court instructing the jury, be very careful. Ms. Holberg got nine, but it's not material. There is no misapplication of Supreme Court precedent. I think maybe we're talking past each other. I don't want to address your question, but really the threshold question here, has there been a misapplication of banks? I don't understand what you're saying, is there a misapplication of Hoffa? I understand what you're saying, is there a misapplication of banks? And banks, when there is an undisclosed informant, who's an informant in other cases, when the words of this court is independent of the relationship, the police-informant relationship, independent of the things that must be indicted, then it's not material. So when you say the words of this court, you mean the Dennis decision? Yes. They're the informant that the informant didn't even testify to, correct? Yes. Okay, the informant, there's no evidence that it was a paid informant. So you might disagree with Dennis. No, no, I'm asking you, when you say in the words of this court, it's like Dennis, that witness for the government didn't even testify at the guilt phase, didn't involve saying this defendant's own words when she accused herself, and the informant wasn't paid. Do you have any case of any appellate court, state or federal, ever upholding a death verdict when the government put on its key witness but the government withheld that that's actually a government agent who's their agent for hire? Do you have any case that you cite in your brief ever that upholds guilt, death guilt, when the government doesn't turn over that evidence? Well, I'm not sure it's our burden. Their burden is she's changing that case. So you don't have a case. Dennis isn't that case. I have a case. But it's not a guilt-based witness. It's not a confession testimony. It's not paid evidence. I know the material is interesting, but if you think, if you disagree with Dennis, maybe you think that. No, I don't disagree with Dennis. But I can submit to you that there's a material, there's a material distinction between Dennis and Dennis, and that's the question here. And I don't think you can say there's no reasonable explanation. Maybe you think that maybe you disagree with Dennis. It has to do with Eric. And we're a Supreme Court so well-founded in the law that you can ignore a fair amount of material. But that's why I said Hoffa. The Supreme Court has told us what we do with false friend testimony. Government puts the false friend in the jailhouse. We know from Fifth Circuit pattern instructions, then that person elicits the molten core fulminante. Oh, this defendant has convicted herself. And we know if she were retried in state court, Texas would give her two separate special instructions had you disclosed this evidence. Number one, jailhouse instruction. Number two, covert agent instruction. Texas gives two. She got none of this. So let me, maybe I can go to your general question directly. I think I've made my point. Yeah, you have. Let's talk about the material. So Charter says that you need to look at the entire trial record and need to look to see whether, excuse me, to look to whether the list of evidence in the context of the entire record and determine from the line of examination that there's a reasonable probability that had the evidence been disclosed, the results of she were convicted or put under my box, the person is in work. And there's these sort of three levels here. We're talking about self-defense. So let's talk about self-defense. And this work came to, as I first said, when you have strong corroboration by additional evidence for a guilty version, it's not material. And what property is material? And so let's talk about what we have. On self-defense, there's a lot of testimony from the medical team. And so we see that the prosecutor got up and disclosed again, indicating the 50-70 cost. He's calling attention to it, Judge Dunbar, to the 50-70 staff votes. Also very powerful was her testimony of self-defense itself. I mean, she had no explanation for why Mr. Cowery had 18 stab wounds in the back, no explanation for why he had nine defensive wounds on his hands, that he was holding my hair for most of the time when I was trying to let go. But, of course, the testimony that Mr. Cowery wrote was a health promise. He was feverish. It took him 45 minutes to walk four blocks. That was the testimony that she incurred. And so on self-defense, I think the most powerful testimony was not the 1980s of Kirkpatrick. It was the testimony of a D.C. primacy investigator, Sergeant Medina. It was the medical examiner. It wasn't a blow-by-blow. And it was her testimony. Now, what the panel has mentioned is that maybe Mr. Kirkpatrick's wounds had testified. And there's a slight effect on that from the St. Hedius Court, which is incorrect. And from June 54, he won. That actually has an outset. I'll give you the reference right here. It is R.O.A. 98,028. Holder was insistent from the outset on wishing to testify and to prevent self-defense until the instance of trial. And after her counsel explained to her the risks of that, however, Holder consistently and adamantly expressed the desire to testify. So this is a case with quite overwhelming additional evidence corroborating Kirkpatrick's testimony. And I know there's a dispute between Penny Dorey and Ms. Evans about the sufficiency of the evidence. Is it not? The way I would view it in that testimony, essentially, this is sort of an added exercise. You don't remove the Kirkpatrick testimony. It's left. It's added with impeaching evidence and saying, what are we going to be able to do with all of this? And we have additional and powerful efforts corroborating it, as you have here, to protect its material. Future dangerousness. I think my friend on the other side rightly, in page 15 of their brief, said the brutality of the crime was enough to show future dangerousness. But you also have the testimony of the record that she may have beaten a man over the head with a cane. She thought she killed him, not her horse. There's a dispute about whether she actually killed him there. But the jury heard evidence that she did that. The jury argued it's an addiction that she had paid to offer. She wanted to add Kirkpatrick to it. She had testimony about violent tendencies with respect to her ex-husband, cops, broken nose, all this stuff. So the evidence of future dangerousness was, I will submit to you again, overwhelming, totally independent of and corroborated by, independent of the Kirkpatrick testimony that helps corroborate the inquiry of the future dangerousness. There was some talk about the robbery, so let me go to that. The evidence, again, was strong corroboration of the robbery. She shows up to Mr. Townsend's apartment, very strutting, very high. She has not very much money. There was some testimony that she said that maybe had $250 or $300. But we know that she sits at the cab driver, $20 there, $20 there. And then she goes into the apartment, and she's the one who introduces her to the cop with the suspect that there was none there. But we know she's coming down, she's looking for a fix, and we have the strong evidence that she goes into her house without this much money, and she leaves. Without the exact amount of money that was missing from the scene, we have testimony from Mr. Townsend's children that he was saving up to buy a car. We have the testimony from Ms. Bob Townsend, Mr. Dale, about her staying at the building, helping them. There's testimony that there was blood on the bills, and that she's carrying a knife, buying crack cocaine, that's his money in part. So there's evidence that she took that money from him. Strong evidence that corroborates it. Is there actually evidence that there's blood on the bills? It seems that there's some sort of dispute between the briefs on that. There was a dispute. I do think the records show that Mr. Mayo testified that Ms. Bob Townsend had left the records, that there was blood on the bills. Did someone tell him that the bills themselves in the records don't show that? Is that the situation? I'm not sure what the bill shows. I don't know what she's got to cover up. But I know the text was from Mr. Mayo, that Ms. Bob Townsend said there was blood on the bills. One of the arguments that you've been on the other side of me today, and also in the brief, is that the intent to rob could have been formed post the murder. And so do you wish to address that? I think we're happy that she can't tell us that. I think the evidence is overwhelming and strong that it was not formed as sort of an afterthought to steal cocaine again. She said she's the one who used the testimony that he was throwing money at me, and it's there. And then we have the circumstantial evidence that you're asking for, the circumstantial evidence that she left. She went there with not much money, and she left with a lot. I mean, there's a question of the jury's mind right there, why did she steal it? I mean, her theory was that I was smoking crack, and that indicated that I was hangry. But her testimony was, I would say, not very believable on this report. On that point, counsel, why did she explain, why, in her view, was a lamp post shoved 11 inches down his throat, making the corroded artery? What was her explanation for the lamp down the throat? Judge Duncan, in the written model's explanation, it appears to me that she was engaged in some kind of defensive exercise, and the lamp just sort of happened to go down his throat. Basically, the medical examiner testified that would be essentially a miracle that that happened, and that it was most likely that she shoved it down his throat, not in terms of a defensive one. The precision that would have to do that while engaged in a 45-minute alleged fight would be amazing. And I believe the medical examiner also testified that the bleeding associated with the lamp down the throat showed that he was alive when she shoved the lamp down his throat. After the jury heard that testimony, heard about the lamp and all of that, the jury heard that she would do it again for money, according to the informant. Why would that? I'm still unclear. Can you explain why that's not material to the sentencing? The fact that I'm pretty cold-blooded. Not only did I have glee when I did this, but that I would do it again for money. Why isn't that pertinent to the material, not just pertinent? So, a couple of reasons. First, I made a cross-interaction, and sort of sadly, according to what everyone said, this is what Kirkpatrick said, but this was top-priority. This was jailhouse talk. We don't actually think that she really enjoyed this. This was just trying to make her look bad. So, I think he sort of blunted the reports with that. But the second thing is that— Counsel? Counsel? He argued that in closing, that he didn't actually ask Kirkpatrick if she thought Holbrooke really meant it, though. Correct? No, he didn't ask for that. He was contentious about it when he had this. But the other argument, the more powerful argument in response to Chief Judge Elrod's question is the other independent evidence of future dangers. Again, my friend notes that in a brief state, the brutality of the crime alone set aside Kirkpatrick and 58 staffers. The lay-up down the throes of Judge Duncan did not explain this at all by Ms. Holbrooke and her testimony. But also, as you know, it had another reason she thought she killed. Trying to get another inmate to kill Kirkpatrick. This is all testimony about future dangers and dangerousness in the record that is separate apart from Kirkpatrick that I think would satisfy a jury that there are plenty of evidence of future dangers. As to whether Kirkpatrick was decisive both for felony murder, the robbery, and future dangerousness, the D.A. Fairings, that's where he started with Kirkpatrick. The first answer he elicited is Kirkpatrick saying Holbrooke told—so the jury's hearing, Holbrooke said that what happened was the man she had some money on, she wanted. He was one of her old sugar daddies that had taken care of her for years. And then Fairing comes back at the very end and elicits exactly that. Both felony status and future dangerousness. Getting Kirkpatrick to say that Holbrooke said that she'd do it all over again, yes she would. Question, why? For drugs. Do you remember her saying anything? Like she'd do it to get drugs or drug money? Yeah, yes I do. And again, as I was explaining, there's other evidence. Besides this testimony, which again, I think I can agree with this point that the jury attorney didn't ask her about Kirkpatrick. But the connection I was quoting from the jury is that we don't actually think she's so sadistic to have done it. This was jailhouse talk. But then in robotic closing, the prosecutor comes back and says we don't believe her, literally, the word he uses is that Holbrooke is a vampire. Don't believe that that's what she enjoyed was drinking. But do believe her in her details. So the prosecutor, robotic closing, no defensibility to respond. What did he return to? Kirkpatrick. And Kirkpatrick, her details are so good. She did it for drugs and money. She'll do it again. She has no remorse. But that's not material to a jury. There are two questions. While they're deliberating, or about whether it was robbery. In the life of the entire trial record, does that concern us? I agree. I agree about that. Wow, that seems really powerful. But again, in the life of the whole trial record? No. No, it's not. But isn't the DA the one who elicited the testimony about Holbrooke thinking the gushing blood looked pretty? Isn't he the one who asked Kirkpatrick? And did she say anything about the blood looking pretty? In response to his specific question. I know it was in her affidavit. But she didn't testify to it. He specifically asked her about those statements, correct? He did ask her about those statements. And the response from the defense is actually, well, the fountain of blood seems implausible, because there's no arterial bleeding. There wasn't shooting anywhere. But separately, I think the prosecutor came along with a scream out when he said, we don't believe she was that callous. We think it was a jailhouse cop. We think it was that way. But the reason she believed her did not because of the explosive nature of those descriptions. But the fact that she had details involving Kirkpatrick that Holbrooke could have told  Then why elicit it? If she didn't say that on her own, then why specifically ask her if that's his intent? Well, there was certainly the record that the affidavit was there. So I suppose the defense could have asked her about it. But if I'm not mistaken, he had said it to you on the Kirkpatrick court. I think, again, there's a whole trove of evidence, which is why I think my friends on the other side say that the brutality of the crime alone, the stabbing nature of the Then why put a paid informant on the stand if you don't need her, if she's the only evidence of intent? Well, she certainly hasn't done enough to say that she's not helpful. But, again, the question is, the prosecutor's decision, the whole trial record, whether that's true, put in context, is not that relevant material. Let's talk about it. When you say it's not the prosecutor's intent, it is the prosecutor's intent. The prosecutor's the only one that knows this is a witness we've been paying in 40 different drug cases. So the prosecutor would, if they don't slightly, at the very last, say, oh, you might not want a believer in anything. What they're doing is protecting themselves from a radioactive Brady claim turning into a Matthew claim that the government withholds evidence and then elicits a law. Of course they can't say believer because they know they've withheld devastating impeachment. I don't know if there's any evidence in the record suggesting the prosecutor's intention would help. Yes, I was going to ask you that. Is there a Matthew claim in this case that the prosecutors, is that even before this court? It's not. It was rejected on the merits in the state court. I don't remember any Matthew claim at all in this case. I don't understand why we're talking about it. I had a question. If Kirkpatrick hadn't testified, would we be here today about whether she was a future danger? No. So the argument of the defense is basically because you put on a jailbird witness who elaborated about the jailhouse confession, that would have caused one, and said, this person has made other cases where she may or may not have even testified, and she might even have written to the judge seeking leniency, which by the way she didn't get, that that would have made one jury decide she wasn't worthy of the death penalty. That's it. That seems to be the argument. There's evidence in the record that Kirkpatrick thought she killed another elderly man by beating him over the head with a cane. I don't want to overstate it. There was evidence from the defense that, well, the cause of death may have been cancer maybe not. But the evidence was that she beat another elderly man over the head with a cane, and she tells us there's also been violence with respect to her ex-husband. Given the violence in the record, it seems that the, I'm going to ask a couple questions about the Strickland. Absolutely. Because it would seem that the strategy to try to have her be a person that could be back in society would be the world's worst strategy, and it also might seem that, and maybe that's not actionable, to have the world's worst strategy, but I would like you to opine on that. But also, it seems that the trial was, of the mitigation phase, the trial, the dangerousness determination, was just, it was not the actual facts at all of what her life was. So what I want to know, at the time that this testimony was proffered, that she just had a normal life until she went boy crazy and she qualified for the Duke TF, but she didn't actually qualify for the Duke TF. But other than that, did the prosecutor and the defense counsel know at the trial that she had been addicted to drugs at birth and that her sibling was stillborn from being addicted to the prosecutor, and the defense counsel know that at the time this testimony was offered at the mitigation phase, at the dangerousness phase? I don't know that they knew that. I'm not sure whether or not that she was addicted to drugs at birth. I think you're going to leave me with this type of question. I have a whole theory. Did the prosecution and the defense counsel know that she was molested at age four or five and that her mother punished her when she reported the molestation and then left her again in the molester's care? Did the prosecution and the defense counsel know that? So Holbrook testified to that. She testified about her. Did the jury heard this? So the jury, did they know that there was something in that or not? I'm sorry, something? Did they know that from the other relatives, the extended relatives at the time? I believe her stepfather and auntie thought that she was a gang rapist. There's no dispute that it's very sad. That she'd been molested at four or five? There was some testimony from herself that she was sexually assaulted at age four. Yes, the jury heard from Ms. Holbrook about molesting at that time. I'm sorry, I have a couple more. Yes. Did the defense counsel and the prosecution know that the stepfather, who appeared to be just this great stepfather, was repeatedly sexualizing her? There's no evidence. There's no evidence in the record that that's the case. So it was not false testimony put on by anybody? No. We're not aware of that. So the district, we can't give you a scorecard. She can't tell us all that. We don't find that credible. There's no evidence to support that. That's a fact we're going to be incorrect. What about the friend of her stepfather's that sexually abused her starting at age 12? Or 13, but I think 12. Was that presented to the jury? And if not, did the defense counsel and or the prosecutor know that at the time? To the contrary. So I'm not going to tell you the distinction between the various sexual assaults that she did testify to. She can't tell us. Again, you're going, I think, to a witness theory, and if I can, I'd like to tell you what they did. What their investigation was. Because it was extensive. And again, this is an investigation. This is D1. Whether the misapplication is strict or not, at this point. There are 88 pages of facts finding from the district court that they can't use to support a presumed correct under D1. They hired a chief intervention investigator for the mental health expert. They interviewed many witnesses. Family members. Friends of his. Prostitutes. Drug addicts. One of her counterparts walked with shoes to a crack house to interview people at night. They interviewed her multiple times. They interviewed her stepfather. They did interview her father. Who was in jail. He was in jail in a very close place. And he had no real impact on her life. But the questions under D1, again, they misapplication it strictly. Here's what the cases they cite are. They cite, if I can, they cite Porter. When I was in Porter, the attorney did not even take the first step of interviewing witnesses or requesting records, so the jury heard almost nothing that was seen by the defense. That's not what happened here. The attorney failed entirely to examine the defendant's prior conviction file. But it knew the prostitute's abuse and which contained evidence depicting the defendant's childhood and mental health very differently from anything the defense counsel had heard. They had heard everything. So they had heard everything. They had heard information about her. Did they hear every single possible thing? I suspect not. Did they hear enough to tell them about her childhood? And the prosecutors didn't know? They didn't know this stuff? Because when they said she had a normal family with a drug use that's not more than normal, did they know that there was heroin and needles in the house and that they gave their children drugs and that they had them in the mess in the bathtub? Did the prosecutor, when they said an oral argument during the case, did the prosecutor know all these things or not at all? I would say yes. Evidence about what the prosecutor knew. Did the defense lawyer know? They certainly knew that she had drugs. I don't know if they knew that there was... That the parents had given her drugs and that this wasn't actually a normal family with a little bit of pot smoking. Oh, she testified that her parents gave her Valium and marijuana. So they heard that. Did they hear it before? And then the last one I have on this is... You know, just text it. I'm concerned that perhaps when it's allowed that someone says, oh, the person was fine until they went boy crazy. When they know that they were molested as a 4-year-old and as a 12-year-old, that's not going boy crazy. That's a result, perhaps, but we don't know because it wasn't testified on, a result of years of being sexualized as a child. And that's not the same thing as being boy crazy. And if you're having sex at 12 and 13, you're not Valida in this day and age. It's a sexual abuse of a minor. And so, does Texas have a viewpoint on this for someone who might be concerned about the mitigation in this case? I agree with you, Judge Ellard, but that wasn't the theory of the defense. That was testified to in Valida. The theory of the defense was that she had a sort of bright future as our Aunt Karen was murdered, which sent her head into a drug and alcohol-fueled sort of depression. There was testimony, again, from over herself, reintroduced as punishment, that indicated that she, her parents were molested instead of, let's say, as an underage student. They thought nothing of the sexual assaults, therefore, that they allowed her to have drugs. But, again, I'd love for you to focus your questions through EDPA. This is EDPA. We have 88 pages of copies of that. We have the different threads. We have the cases they cite where there was no investigation done. And, again, there are different readings right here. This looks nothing like those cases that they cite, and so it can be hard for the community to have support control. There was a misapplication of stripping, contrary to a reasonable application of stripping, particularly for a convictor, or the Supreme Court convictors that the more general the standards, the more reasonable. I think that whatever else you can say, trial the defense counsel and indicate that they certainly adequate performance into their investigation. And, again, there's no prejudice that the state agencies worked on that twice. Thank you very much. Thank you. We have your argument. We appreciate it. Thank you. Mr. Abernathy, you're taking time for rebuttal, sir. Mr. Abernathy, while you're getting it together, I'm right up here. I'll hit you before you start to get mine in. Just quickly, come back to we're at the re-litigation bar, so just refresh my memory. Just refresh my memory as to what your specific argument is that you're relying on to get you over the edge of the re-litigation. I've heard all about the trial, but you've got a lot in there, but just say it so I'll understand. What specifically is your argument about the re-litigation bar in terms of what we have to hold here? What are the specific cases that you're relying on for the in-bank court in light of the valentine's call? Well, your Honor, I think our fundamental disagreement with the state here and our fundamental argument on this is that banks, the principle that constitutes the whole is of bringing in... That's not my question. That's not my question. I want to know, grappled with the EFPA statute and articulate it for me, for us, what is the holding you would have this court make with respect to the EFPA standards in light of this case? Don't tell me what the facts are in the case. Do you follow me? I hope so. Let me try again. Our argument is that if you apply the EFPA standard in 2254D, it was an unreasonable application of clearly established federal law to hold that... And the clearly established federal law was? It's banks, primarily, that have paid infillments... Paid in this case? Over here, sorry. Paid in this case? Not paid in this case. In the banks? What's the infillment paid in which case? In the same case. In the same case. And so this is not the same as banks? Well, that's our fundamental disagreement with the state. How is it the same? You've heard a lot about... Hold on, hold on. Go ahead. I don't need co-counsel here. We'll elaborate on the point. But to what Judge Oldham is asking, it's sort of the same. And that's narrowing it. So what I'm asking is not this, the shotgun shot, but the rifle shot, you know, clearly on these facts. That's all I'm asking. Read the briefs and like that. I just want to make sure I understand. It's an unreasonable application of banks to conclude that because the paid agent of the state, Kirkpatrick, was paid in other cases, that it's not... The state is obligated to disclose the chief of the paid agent of the same police department that that decision is not material. And it's an unreasonable application of banks. So you only have to disclose that this person is your paid agent if you're paying her in the same case. It doesn't go to the fundamental principle underlying banks, which is the paid informant testimonial of every suspect. And it's not the fundamental principle of evidence law. So we held the opposite in Dennis and said Dennis was wrong. Dennis was wrong. Got it. And what is the state of the law in circuits across the country extending banks in the other cases? Because we've heard a lot today, primarily from the bench, about this paid agent hired testimony. But there's no evidence, as I understand it, that she was paid in this case. And that any of her testimony was purchased in this case. She may have had other deals in other cases. But we've already held in Dennis that that does not resurmount the litigation bar to judge Dennis' question. I don't remember the specific case. I'm sorry. But there are two cases cited in our briefs. First, what you cite is the Sixth Circuit Robinson decision. And it says, first, the facts show Sims assisted authorities as a C.I. in exchanges paid for his services. Regardless of whether the cases were unrelated, Sims had a working relationship with law enforcement, including the agency spearheading the investigation of this case. Robinson was entitled to present such evidence to the jury. Second, the prosecutor's actual knowledge is irrelevant because the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the same court stricter. Moreover, regardless of whether the prosecution succeeds in meeting the application, its responsibility for failing to disclose favorable evidence rising to the material level is inescapable, citing Kyle's. So published circuit authority applying Kyle's stricter says paid informed status to the same police department, same time, is a fundamental Brady violation. Dennis, as we discussed earlier, not a guilt-based witness, not confession evidence, not paid. Is that all correct? That's all. That's the essence of it. There are two reported cases that you cited where they were not paid on the same case. Your Honor, I'll just make a humble request, given the length of time that the sentence and the case were discussed, in response to your question, if I could just have a couple of minutes to address the same questions you discussed with my learned adversary for the case. You have one minute. So the evidence is a lot more echoical on future dangerousness. E.R. Williams died of a pancreatic cancer death certificate. The witnesses who said Holbrook hit him over the head, they didn't believe her. And that, by the way, could have been the same kind of jailhouse thought that the prosecutor was talking about. Talking about silencing Kirkpatrick, the witnesses who testified to that, I didn't believe she actually intended violence. The state expert, who clearly was important on the sentence, relied on Kirkpatrick's  And as the state said several times, state's counsel, the brutality of the crime was sufficient to establish future dangerousness. Legally, it's sufficient, which led to the quote we were making, that it was a terrible strategy to rely heavily, if not entirely, on future dangerousness in sentencing. But it doesn't mean that Kirkpatrick wouldn't have had a material effect. In terms of your question, Your Honor, about what was known or not known, I obviously can't do that in six seconds. But a lot of the evidence was not known, or the defense counsel undermined it with other evidence. That's where I'm being. Thank you for your indulgence, Your Honor. Thank you. This case is submitted. The court will take a recess. Recess before considering the next case of the day.